_____
                                                  )
**DEWAINE QUICK, et al.,**                        )
                                                  )
    **Plaintiffs,**           )
                                                  )
       **v.**    )     **Case No. 17-cv-01242 (APM)**
                                                  )
**EDUCAP, INC., et al.,**                         )
                                                  )
    **Defendants.**            )
_____       )

## MEMORANDUM OPINION

This case is born out of two student loans issued by Defendant HSBC Bank, one to Plaintiff Dewaine Quick and the other to Plaintiff Lynn Davis, as co-signer for her niece. Although the two loans are unrelated, Plaintiffs' stories are much the same. After each loan went into default, Defendant EduCap, represented by Defendant Weinstock, Friedman & Friedman, filed a collection action against each Plaintiff in D.C. Superior Court. In those cases, EduCap sought the balance of the loan, unpaid interest, and attorneys' fees. Quick never appeared, and eventually the D.C. Superior Court entered a default judgment against him. Davis, on the other hand, appeared and agreed to entry of a consent judgment against her.

Approximately two years later, Plaintiffs filed this case as a class action, alleging that EduCap, Weinstock, and HSBC (collectively, "Defendants") violated state and federal law through their joint debt-collection activities. Plaintiffs' suit centers on a single alleged transgression: that EduCap falsely misrepresented in the collection actions that EduCap, as opposed to HSBC, had entered into the loan agreements with Plaintiffs. That falsehood, Plaintiffs maintain, enabled

EduCap to foreclose on their defaulted loans when it had no right to do so. EduCap repeated this unfair debt collection practice, according to Plaintiffs, in state courts throughout the country.

This matter is before the court on Defendants' motions to dismiss and Plaintiffs' motion for leave to amend their complaint. Defendants argue that this suit must be dismissed for two primary reasons: (1) the *Rooker-Feldman* doctrine divests the court of subject-matter jurisdiction; and (2) the doctrine of res judicata precludes Plaintiffs' claims. Additionally, Defendants move to dismiss all causes of action for failure to state a claim and a subset of them for lack of standing. For the reasons that follow, Defendants' motions to dismiss are granted, and Plaintiffs' motion for leave to amend their complaint is denied as futile.

## I. BACKGROUND

### A. Factual Background[1]

This case arises out of two student loans taken out more than a decade ago. On July 2, 2007, Plaintiff Lynn Davis co-signed a student loan issued by Defendant HSBC to her niece. *See* Pls.' Mot. for Leave to File Second Am. Compl., ECF No. 24, Second Am. Class Compl., ECF No. 24-1 [hereinafter Second Am. Compl.], ¶¶ 25–27. The loan agreement obligated Davis, as co-signer, to repay the amount of the loan and interest to HSBC, *see id.* ¶¶ 26–27, and identified Defendant EduCap as the loan servicer, *see id.* ¶ 39. *See also* Pls.' Mot. for Class Cert., ECF No. 12, Ex. B, ECF No. 12-3 (copy of Verified Complaint against Davis) [hereinafter Davis Compl.].[2]

---

[1] The recited facts are based on the allegations set forth in Plaintiffs' proposed Second Amended Complaint, ECF No. 24-1.

[2] Although not filed as exhibits to Plaintiffs' complaint, the D.C. Superior Court records in Davis's and Quick's respective collection actions are attached as exhibits to Plaintiffs' Motion for Class Certification, ECF No. 12. The court can consider these records in resolving the motions to dismiss because they are incorporated into the complaint and are subject to judicial notice. *See Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017); *Covad Commc'ns. Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005). The court also may consider these records in resolving Defendants' jurisdictional challenge. *See Gulf Coast Mar. Supply, Inc. v. United States*, 867 F.3d 123, 128 (D.C. Cir. 2017).

Plaintiff Dewaine Quick's story is similar. Quick took out a student loan from HSBC for $16,200 on July 30, 2007. Second Am. Compl. ¶¶ 18–20. The loan agreement obligated Quick to repay the amount of the loan with interest to HSBC, *id.* ¶¶ 19–20, and identified EduCap as the loan servicer, *see id.* ¶ 39. *See also* Pls.' Mot. for Class Cert., Ex. C, ECF No. 12-4 (copy of Verified Complaint against Quick) [hereinafter Quick Compl.].

When Plaintiffs obtained these loans, EduCap, HSBC, and other private lenders were part of a "partnership" created for the purpose of disbursing student loans, which Plaintiffs refer to as the "L2L" partnership. Second Am. Compl. ¶ 59. At the same time, EduCap sponsored a trust entity known as the L2L Education Loan Trust 2006-1 ("the L2L Trust"), which was an asset-backed security that held a pool of direct-to-consumer student loans originated by various private banks. *See id.* ¶ 60. The L2L Trust operated in the following manner: HSBC sold to EduCap student loans that it had originated, and EduCap in turn conveyed legal title to those loans to the L2L Trust. *Id.* ¶ 65. The Trust then issued securities that were backed by the future receivables on the underlying student debt. *Id.* This arrangement allowed the L2L Trust's creators—which included HSBC and EduCap—"to convert future receivables on [student] loans into immediate cash while, at the same time, insulating HSBC and EduCap from potential risk." *Id.* ¶ 63. Under this arrangement, HSBC would receive money when it sold its student loans to EduCap, EduCap would receive money when it transferred title to the L2L Trust, and the L2L Trust would receive money from investors, whose return was based on the expected future stream of student loan repayment. *Id.* ¶ 67.

The financial crisis of 2007, however, changed everything. At that point, according to Plaintiffs, "the Defendants' plan began to unravel in a failure of colossal proportions." *Id.* ¶ 68. Market conditions rendered EduCap "unable" to buy student loans. *Id.* ¶ 69. To "avoid financial

collapse," HSBC bought some of its loans back from EduCap, and it retained, sold, or securitized other loans, "thereby generating millions of dollars to improve its balance sheet and financial performance ratios." *See id.*

Eventually Quick defaulted on his student loan, leading EduCap to file a debt collection action in D.C. Superior Court. *Id.* ¶¶ 21–22. Defendant Weinstock, Friedman & Friedman ("Weinstock"), the law firm that filed the complaint, identified "EDUCAP Inc." as the plaintiff, *id.* ¶ 22, even though EduCap was neither the loan originator nor a party to the promissory note, *see id.* ¶¶ 40–41; *see also* Quick Compl. The complaint against Quick sought repayment of the loan balance and pre-judgment interest. Second Am. Compl. ¶ 23; Quick Compl. ¶ 2. It also demanded payment of an additional $2,263.01, as a "15% contingency-based attorney's fee" based on the balance of the loan, *id.*, even though the terms of Quick's promissory note did not allow for the collection of such fees, *see* Second Am. Compl. ¶ 24.

Davis's story is much the same. After the primary borrower defaulted, Weinstock filed a debt collection action against Davis in D.C. Superior Court on December 4, 2013. *Id.* ¶¶ 28–29; *see generally* Davis Compl. As in the action against Quick, the Davis lawsuit incorrectly listed "EDUCAP Inc." as the plaintiff.[3] Second Am. Compl. ¶ 29; *see id.* ¶¶ 40–41. And, as with the debt collection action against Quick, Weinstock's lawsuit against Davis sought a 15 percent contingency-based attorney's fee, amounting to $785.50, even though that fee was not authorized by the terms of the promissory note. *See id.* ¶¶ 30–31; Davis Compl. ¶ 2.

Plaintiffs allege that these debt collection actions were premised on a lie: that EduCap had power to bring them. To establish EduCap's standing, Weinstock attached to both the Quick and

---

[3] This allegation is incorrect. As the actual Davis Complaint shows, the plaintiff was identified as "EDUCAP, INC. on behalf of HSBC Bank USA, National Association." *See* Davis Compl. at 2 (page number automatically generated by CM/ECF). This error, however, is immaterial to the court's decision.

Davis complaints a sworn affidavit from EduCap employee Marcus Maiorca. The Maiorca Affidavit falsely stated that Quick and Davis had "entered into a written promissory note with *EduCap*," when in fact HSBC had issued the loans and EduCap did not own the loans at the time. *See* Second Am. Compl. ¶¶ 35, 40–41; Quick Compl. at 4; Davis Comp. at 4. This affidavit, filed in thousands of other debt collection actions brought by EduCap, was used to "trick courts and consumers across the country into believing that EduCap [was] the actual creditor, or ha[d] authority to sue on behalf of HSBC." Second Am. Compl. ¶ 55. At the time of the actions against Quick and Davis, Weinstock "only represented EduCap"; it had no attorney-client or employment relationship with HSBC. *Id*. ¶ 38.

Defendants' deceitful conduct continued during the pendency of the collection actions, as Weinstock repeatedly sought to change the named plaintiff. In 2015, Weinstock moved to change the plaintiff in the case against Quick from "EduCap" to "EduCap, Inc. on behalf of HSBC Bank USA, N.A." *Id*. ¶ 42. The Superior Court entered a default judgment against Quick two weeks later. *Id*. ¶ 43. But in 2017 Weinstock once again asked permission to change the named plaintiff in Quick's case—this time, to "HSBC Bank, USA, N.A" *Id*. ¶ 44. As for Davis, she agreed to entry of a consent judgment on July 16, 2015, whereby she promised to pay $5 each month directly to Weinstock. *Id*. ¶ 45. Davis has paid Weinstock $5 a month ever since. *See id*. In 2017, Weinstock successfully moved to change the named plaintiff against Davis to "HSBC Bank USA, N.A." *Id*. ¶ 46.

## B. Procedural Background

Some two years later, this federal action followed. Plaintiffs filed a class-action complaint on June 26, 2017, which they amended as of right on July 10, 2017. *See* Compl., ECF No. 1; Am. Compl., ECF No. 6. The Amended Complaint asserts claims under the federal Racketeer

Influenced and Corrupt Practices Act ("RICO"), 18 U.S.C. §§ 1962 *et seq*.; the federal Fair Debt

Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq*.; the District of Columbia Debt

Collection Law, D.C. Code § 28-3814; as well as common law claims of abuse of process and

unjust enrichment. *See generally* Am. Compl. Defendants moved to dismiss the Amended

Complaint on August 31, 2017. *See* HSBC's Mot. to Dismiss, ECF No. 15 [hereinafter HSBC's

Mot.]; EduCap & Weinstock's Mot. to Dismiss, ECF No. 17 [EduCap & Weinstock's Mot.].

On November 17, 2017, after briefing on Defendants' motions had concluded, Defendant

HSBC sent Plaintiffs a draft Rule 11 sanctions motion, asserting that the "foundational factual

predicate" for Plaintiffs' First Amended Complaint "was unequivocally false." Def. HSBC Bank

USA, N.A.'s Opp'n to Pls.' Mot. for Leave to File Second Am. Compl., ECF No. 26 [hereinafter

HSBC's Opp'n], at 4–5; *see* Pls.' Mot. for Leave to file Second Am. Compl., at 1, 3; *id*., Ex. B.,

ECF No. 24-2 [hereinafter HSBC's Draft Rule 11 Mot.]. HSBC accused Plaintiffs' counsel of

possessing "key facts that refuted his theory that Plaintiffs' loans were securitized." HSBC's Draft

Rule 11 Mot. at 1. More specifically, according to HSBC, counsel had learned through discovery

in another case that "Plaintiffs' loans were owned by HSBC and never securitized." *Id.* HSBC

did not, however, file a Rule 11 sanctions motion.

Thereafter, on December 5, 2017, Plaintiffs moved to amend their complaint a second time,

seeking to add "facts and claims arising from recent admissions by HSBC" in its draft Rule 11

memorandum. Pls.' Mot. for Leave at 1. Plaintiffs' motion identifies two such admissions: (1) that

HSBC bought back Davis's loan from EduCap in December 2008, and (2) that HSBC has held

Quick's loan since it originated. *Id*. at 5. These statements, Plaintiffs claim, show that "Defendants

engaged in unlawful debt collection by misrepresenting EduCap as the actual creditor." Pls.' Mot.

for Leave at 6; *see also id*. at 5. Plaintiffs' Second Amended Complaint thus proposes to add

allegations that HSBC owned Plaintiffs' loans at the time Weinstock filed the D.C. Superior Court actions. *See* Second Am. Compl. ¶¶ 53–54; *see also* EduCap & Weinstock's Opp'n to Pls.' Mot. for Leave to File Second Am. Compl., ECF No. 25 [hereinafter EduCap & Weinstock's Opp'n], Ex. B, ECF No. 25-1 (redlined copy of Plaintiffs' Second Amended Complaint) [hereinafter Redlined Second Am. Compl.].[4]

The court held a hearing on the pending motions on April 18, 2018, and now turns to the merits.

## II.    DISCUSSION

### A.    Dismissal Under Rule 12(b)(1)

The court begins with three jurisdictional issues: (1) whether the court lacks subject-matter jurisdiction over Plaintiffs' claims under the *Rooker-Feldman* doctrine; (2) whether both Plaintiffs lack standing to sue HSBC; and (3) whether Plaintiff Quick possesses standing to assert any claims. Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). In deciding a Rule 12(b)(1) motion, the court "may consider materials outside the pleadings," but "must still accept all of the factual allegations in the complaint as true." *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005) (citation and alteration omitted). "Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation

---

[4] The proposed Second Amended Complaint makes contradictory allegations about the loans' ownership at the time EduCap initiated the D.C. Superior Court actions. On the one hand, Plaintiffs claim that HSBC owned the loans when the suits were filed. *See* Second Am. Compl. ¶ 53 (alleging the HSBC owned Davis's loan when the collection action was filed); *id.* ¶ 54 (alleging that HSBC owned Quick's loan when the collection action was filed). Yet, at the same time, Plaintiffs have retained the allegation from their earlier complaints that L2L Trust was the true owner of the loans and only the L2L Trust could have filed suit. *Id.* ¶ 73. In the end, Plaintiffs appear to hedge their bets, alleging that HSBC "owned, sold, *or* securitized the loans." *See, e.g., id.* ¶¶ 105, 108, 120 (emphasis added). These muddled allegations do not ultimately affect the court's rulings.

to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Accordingly, "'the plaintiff's factual allegations in the complaint will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Id.* (quoting 5A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. 2d § 1350).

For the reasons that follow, the court finds that: (1) it lacks jurisdiction under the *Rooker-Feldman* doctrine to hear Plaintiffs' RICO, unjust enrichment, and abuse of process claims, but has jurisdiction as to their federal and District of Columbia unfair debt collection statutory claims; (2) Plaintiffs lack standing to pursue claims against HSBC; and (3) Plaintiff Quick has standing to pursue some but not all of his claims against EduCap and Weinstock.

### 1. *Rooker-Feldman*

The court begins with Defendants' argument that Plaintiffs' lawsuit is a de facto challenge to final state court judgments—the District of Columbia collection actions—and, as a result, this court lacks subject-matter jurisdiction under the *Rooker-Feldman* doctrine. HSBC's Mot., Mem. in Supp., ECF No. 15-1 [hereinafter HSBC's Mem.], at 9–13; EduCap & Weinstock's Mot., Mem. in Supp., ECF No. 17-1 [hereinafter EduCap & Weinstock's Mem.], at 10–12; *see also* EduCap & Weinstock's Opp'n at 10–11; HSBC Opp'n at 7–8. Because Plaintiffs do not expressly seek as relief the undoing of the D.C. Superior Court judgments, Defendants argue that Plaintiffs' current action is "inextricably intertwined" with the D.C. Superior Court judgments because the "core" of their federal claims "is that EduCap did not have standing to pursue the collection actions." HSBC's Mem. at 10–11; *see also* EduCap & Weinstock's Mem. at 7. They believe the suit is tantamount to a request to undo the D.C. Superior Court judgments because, in order to succeed on their claims, Plaintiffs "must demonstrate that the D.C. Superior Court wrongly entered

judgments in favor of EduCap despite EduCap's purported lack of standing." HSBC's Mem. at 10–11; EduCap & Weinstock's Mem. at 7. Plaintiffs counter that *Rooker-Feldman* does not apply here because their challenge is to Defendants' *pre-judgment* unfair debt collection practices—namely, the drafting of the false Maiorca affidavit—rather than the D.C. Superior Court judgments themselves. *See* Pls.' Omnibus Opp'n to Mots. to Dismiss, ECF No. 20, Pls.' Mem. in Supp., ECF No. 20-1 [hereinafter Pls.' Opp'n], at 9–11; Pls.' Omnibus Reply Br., ECF No. 27 [hereinafter Pls.' Reply]. Alternatively, Plaintiffs argue that, because Defendants procured the D.C. Superior Court judgments by fraud or deception, *Rooker-Feldman* does not divest this court of jurisdiction. *See* Pls.' Opp'n at 10 n.69.

The *Rooker-Feldman* doctrine hails from the only two Supreme Court cases in which the Court has applied it: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). The doctrine is rooted in 28 U.S.C. § 1257, a statute that vests sole authority in the Supreme Court to review state court judgments. *See Skinner v. Switzer*, 562 U.S. 521, 531 (2011). In both *Rooker* and *Feldman*, the plaintiffs "asked the District Court to overturn the injurious state-court judgment," and in both cases the Court held that "District Courts lacked subject-matter jurisdiction over such claims." *Id.*

Since the *Rooker* and *Feldman* cases, the Supreme Court has emphasized that the doctrine occupies a "narrow ground." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *see Croley v. Joint Comm. on Judicial Admin.*, No. 15-5080, 2018 WL 3320864, at *4 (D.C. Cir. July 6, 2018). In *Exxon Mobil*, the Court instructed that the doctrine "is confined to cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." 544 U.S. at 284. This limited construction of *Rooker-Feldman*

means that district courts do not lack jurisdiction "simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Id.* at 293. Rather, "[i]f a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'" *Id.* (citation omitted and second alteration original). Thus, a prior state court decision will not automatically strip a federal court of jurisdiction where the federal matter shares common parties and issues with its state court predecessor. *See Skinner*, 562 U.S. at 532.

Neither party cites a D.C. Circuit case that applies *Rooker-Feldman* to facts similar to those presented here. In lieu of such precedent, Defendants direct the court primarily to district court cases from this jurisdiction. *See* HSBC's Mem. at 10–13. None of these cases, however, contain an allegation that the earlier state court judgment was procured by fraud. *See id.* Thus, they are of limited value in this instance because they are not precedential and because they are not on all fours with the facts of this case.

When other circuit courts have been presented with circumstances similar to those at issue here, they have split on the outcome. For instance, in *Todd v. Weltman, Weinberg & Resi Co., L.P.A.*, 434 F.3d 432 (6th Cir. 2002), the Sixth Circuit considered an FDCPA claim brought by a plaintiff who alleged that the defendant in an earlier state court garnishment proceeding succeeded in freezing the federal plaintiff's bank account by filing a false affidavit attesting that the defendant had complied with certain state law requirements, when in fact the federal defendant had not done so. *Id.* at 437. Responding to the defendant's invocation of the *Rooker-Feldman* doctrine, the Sixth Circuit held that the defendant's jurisdictional argument "ignores the fact that Plaintiff here does not complain of injuries caused by this state court judgment, as the plaintiffs did in *Rooker*

and *Feldman*.  Instead, after the state court judgment, Plaintiff filed an independent federal claim that Plaintiff was injured by Defendant *when he filed a false affidavit*." *Id.* (emphasis added).  The *Rooker-Feldman* doctrine therefore did not apply.  *Id.*[5]  The Second Circuit reached the same conclusion in *Gabriele v. American Home Mortgage Servicing, Inc.*, 503 F. App'x 89 (2d Cir. 2012), a case in which the plaintiff brought an FDCPA claim based on various alleged misdeeds in earlier state court proceedings, including the "filing of three allegedly false affidavits, two of which were signed by employees of" the defendant company.  *Id.* at 92.  The court held that *Rooker-Feldman* did not bar the plaintiff's claims because the plaintiff "does not complain of injuries *caused* by the state court judgment."  *Id.*  Instead, the court held, the alleged litigation misconduct was "simply ratified, acquiesced in, or left unpunished by the state court judgment," and, because the plaintiff did not seek to undo the state court judgment, *Rooker-Feldman* did not bar the federal action.  *Id.* (internal quotation marks and citation omitted).

But the Seventh Circuit came to the opposite conclusion in a case presenting similar circumstances.  In *Andress v. Daubert Law Firm, LLC*, 667 F. App'x 154 (7th Cir. 2016), the plaintiff brought a federal action in which he alleged that the defendants had procured a default judgment in a state-court debt collection action in violation of the FDCPA by, among other things, concealing "the identity of the real party in interest."  *Id.* at 155.  The Seventh Circuit concluded the *Rooker-Feldman* doctrine barred the plaintiff's FDCPA claims because none of the alleged violations "could have resulted in injury independent of the judgment or the subsequent

---

[5] Interestingly, a later panel of the Sixth Circuit, without citing to *Todd*, came to the opposite conclusion in an unpublished decision.  In *Kafele v. Lerner, Sampson & Rothfuss, L.P.A.*, 161 F. App'x 487 (6th Cir. 2005), the plaintiff bought an FDCPA claim following a foreclosure action on his home in state court, alleging that the state court judgment was procured by "willful fraud" as the named defendants and their attorneys brought the foreclosure action "without being holders in due course of their claims."  *Id.* at 490.  The court held that *Rooker-Feldman* precluded exercise of federal jurisdiction because "there is simply no way for this or any other court to grant relief without disturbing the judgments of foreclosure entered by the state court."  *Id.*  The court thought the plaintiffs' gambit particularly "brazen" because they had not appeared in the state court proceedings.  *See id.*

garnishment orders." *Id*. The parties here acknowledge each of the circuit court decisions cited above, and try to distinguish them in a manner that benefits their respective positions.

In this court's view, while these decisions serve as helpful guideposts, none provide the answer for *all* claims in this case. Instead, guided by the Supreme Court's admonition that *Rooker-Feldman* rests on "narrow ground," *Exxon Mobile*, 544 U.S. at 284, the court concludes that some of Plaintiffs' claims are barred by the *Rooker-Feldman* doctrine, while others are not. *See Stanton v. District of Columbia*, 127 F.3d 72, 76 (D.C. Cir. 1997) (finding that *Rooker-Feldman* barred some claims but not others).

The court's conclusion turns on the showings that Plaintiffs must make to prove each claim and the relief sought. Take Plaintiffs' RICO claims, Counts I and II. They allege that Defendants engaged in a pattern of racketeering activity that included "obtaining unlawful judgments" and "receiving, investing and reinvesting income derived from unlawful L2L debt collection lawsuits." Second Am. Compl. ¶¶ 87–88. Plaintiffs also allege that Defendants' unlawful acts, including securing the allegedly unlawful judgments, proximately caused them harm. *Id*. ¶ 90. They seek "judgment in their favor . . . for treble damages suffered by them as a result of the Defendants' predicate acts and violations." *Id*. ¶ 91. If Plaintiffs' RICO allegations are proven true, it would mean that the state court judgments against Plaintiffs are "unlawful" and would result in an award of damages that would be tied directly to payments made to satisfy the judgments, e.g., the $5 monthly paid by Davis to Weinstock, *see id*. ¶ 45. Therefore, as pleaded, Plaintiffs' RICO claims "invite[ ] district court review and rejection" of the Superior Court judgments, a consequence barred by *Rooker-Feldman*. *Exxon Mobile*, 544 U.S. at 284. The same outcome would result if Plaintiffs were to prevail on their claims for unjust enrichment, Count III, and abuse of process, Count VI. In those claims, Plaintiffs assert, respectively, that "it would be inequitable for the

Defendants to retain any amounts obtained from Plaintiffs without returning the value thereof in that such amounts are not owed to the Defendants," *id.* ¶ 100, and that Defendants' ulterior motive in misusing the legal process was to, among other things, "obtain[ ] unlawful judgments" and secure "payments for unlawful amounts," *id.* ¶¶ 135, 137. Thus, like Plaintiffs' RICO claims, their common law tort claims allege that their harms flow from the D.C. Superior Court judgments and seek review and rejection of those judgments. *Rooker-Feldman* bars jurisdiction as to those causes of action. *See Croley*, 2018 WL 3320864 at *5.

A different result obtains as to Plaintiffs' federal and District of Columbia unfair debt collection practices claims, Counts IV and V, respectively. These claims, as pleaded, are "independent" of the Superior Court judgments. *See Skinner*, 562 U.S. at 532 (holding that *Rooker-Feldman* did not apply because the plaintiff did not "challenge the adverse [state-court] decisions themselves"). In these two counts, Plaintiffs allege injuries caused by the filing of the allegedly false Maiorca affidavit, not from the judgments themselves. *See Todd*, 434 F.3d at 437; *Gabriele*, 503 F. App'x. at 92. For instance, the FDCPA claim alleges only that EduCap and Weinstock violated the statute by "falsely claiming Plaintiffs entered into a written promissory note with EduCap," Second Am. Comp. ¶ 104, and "falsely claiming that EduCap was the real party in interest when HSBC owned, sold, or securitized the loans," *id.* ¶ 105; *see also id.* ¶¶ 120–21 (making similar allegations in facts underlying D.C. Debt Collection Law claim). Moreover, the FDCPA claim and its D.C. analog do not seek to declare the underlying judgments to be unlawful or demand the return of payments made to satisfy those judgments. Instead, they seek compensatory and punitive damages arising from the alleged unfair debt collection practice itself. *See id.* ¶¶ 129–30. Accordingly, even though Plaintiffs' success on their unfair debt collection practices claims would deny the conclusion that EduCap had standing to bring the collection

actions, those claims are sufficiently independent of the judgments themselves to avoid the *Rooker-Feldman* bar.

Having concluded that *Rooker-Feldman* prohibits review of some of Plaintiffs' claims, the court turns to Plaintiffs' alternative argument that *Rooker-Feldman* does not apply when, as here, the state court judgment is procured by fraud. *See* Pls.' Opp'n at 9–10 n.69 (quoting *Kafele*, 161 F. App'x at 490). The court finds that, even if the fraud exception applies, it would not help Plaintiffs. The fraud exception to the *Rooker-Feldman* doctrine allows a federal court to "entertain a collateral attack on a state court judgment which is alleged to have been procured through fraud, deception, accident or mistake which . . . deceived the Court into a wrong decree[.]" *Sun Valley Foods Co. v. Detroit Marine Terminals Inc. (In re Sun Valley Foods Co.)*, 801 F.2d 186, 189 (6th Cir. 1986) (quoting *Resolute Ins. Co. v. North Carolina*, 397 F.2d 586, 589 (4th Cir. 1968), which discusses a fraud exception to res judicata, not *Rooker-Feldman*). The D.C. Circuit has never expressly embraced the fraud exception in a published decision, but it has acknowledged it in an unpublished opinion, *Scott v. Frankel*, No. 15-5028, 2015 WL 4072075 (D.C. Cir. June 8, 2015) (per curiam). In *Frankel*, the court recognized that the fraud exception to the *Rooker-Feldman* doctrine is limited to cases of "extrinsic fraud." *Id*. at *1 (citing *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1141 (9th Cir. 2004)). "Extrinsic fraud is conduct which prevents a party from presenting his claim in court." *Id.* (quoting *Kougasian*, 359 F.3d at 1140). The court in *Frankel* held that, even if it were to recognize the exception, it would not apply in that case because "appellant has not suggested any reason why he could not have presented his claims of fraud in the state court [ ] proceeding." *Id.*

The same is true here. Plaintiffs offer no reason why the alleged falsehood contained in the Maiorca Affidavit prevented them from challenging EduCap's standing to collect on their

debts. As Plaintiffs admit, Quick and Davis both took out loans that originated with HSBC that, per the terms of the loan documents, obligated them to repay HSBC. *See* Second Am. Compl. ¶¶ 19–20; 25–27. Further, Plaintiffs concede that EduCap's name appeared only "peripherally in the loan documents[,] as entitled to service loans by reviewing and receiving loan applications, processing forbearances, and checking borrower credit and income." *Id*. ¶ 39. The actual loan documents, copies of which were attached to each of the complaints against Quick and Davis, confirm these allegations. First, the Truth in Lending Disclosure Statement for both Plaintiffs identifies the "LENDER" as HSBC and provides that the borrower "promise[s] to pay HSBC Bank USA, N.A. the loan Amount with interest at a Variable Rate." *See* Quick Compl. at 21–22; Davis Compl. at 22–23. Second, the "Combined Private Education Loan Education Loan Application and Promissory Note" for both Plaintiffs defines "HSBC Bank USA, National Association" as the counterparty to the loan agreement. *See* Quick Compl. at 12; Davis Compl. at 10. Finally, Davis's relative's loan disbursement check was issued by "HSBC Bank USA, N.A." Davis Compl. at 26. Thus, even if the Maiorca Affidavit falsely represented that Plaintiffs had entered into written promissory notes with EduCap, the documents attached to the complaints informed them that HSBC was their original lender and provided Plaintiffs ample fodder with which to challenge EduCap's standing to bring suit. Therefore, the fraud alleged in this case is not "extrinsic" and falls outside the bounds of the fraud exception to the *Rooker-Feldman* doctrine.

In sum, the court lacks subject-matter jurisdiction under the *Rooker-Feldman* doctrine to hear Plaintiffs' RICO, unjust enrichment, and abuse-of-process claims. Accordingly, those claims are dismissed. Jurisdiction as to Plaintiffs' federal and District of Columbia statutory unfair debt collection practices claims is not, however, barred by *Rooker-Feldman*.

### 2. *Article III Standing*

The court now arrives at the two standing questions: (1) whether Plaintiffs have standing to allege claims against HSBC, and (2) whether Quick has standing to assert his claims at all. The plaintiff bears the burden of establishing the three elements of constitutional standing: (1) that the plaintiff "suffered an injury in fact"; (2) that there exists a "causal connection between the injury and the conduct complained of"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." 504 U.S. at 560–61. At the pleading stage, the plaintiff "must clearly . . . allege facts demonstrating" each element. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (internal quotation marks and citation omitted). The court must "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). However, "[t]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009)) (alterations original). The court also need not "accept inferences that are unsupported by the facts set out in the complaint." *Id.* (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)). Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to assert a claim of standing that is plausible on its face. *See id.*

### a. Plaintiffs' Standing to Assert Claims Against HSBC

HSBC argues that Plaintiffs have not made out a plausible claim of standing against it, because the complaint fails to allege injury that is "fairly traceable" to HSBC's alleged misconduct. HSBC's Mem. at 13–14. The causal connection element of standing asks whether the complained-of injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 561 (cleaned up).

The required causal relationship should not be confused with tort concepts such as proximate cause. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014). Rather, "[c]ausation, or 'traceability,' examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, [ ] cause[d] the particularized injury of the plaintiff." *Orangeburg, S.C. v. Fed. Energy Regulatory Comm'n*, 862 F.3d 1071, 1080 (D.C. Cir. 2017) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc)).

Having carefully scrutinized Plaintiffs' pleading, the court agrees with HSBC that Plaintiffs have not "clearly . . . allege[d] facts demonstrating" that Plaintiffs' claimed injuries are "fairly traceable" to actions by HSBC as to any claim. *See Spokeo*, 136 S. Ct. at 1547 (internal citation omitted). In so holding, the court is mindful that it must take care "not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003). The court reaches its conclusion because Plaintiffs' pleading alleges *no conduct* on the part of HSBC related to the alleged unlawful debt collection action against them.

The only factual allegations concerning HSBC relate to its participation in the investment arrangement operated by the L2L Partnership. Beyond that, the complaint is silent as to any conduct by HSBC. Plaintiffs maintain that, in mid-2007, the L2L Partnership essentially collapsed due to market conditions, as EduCap was unable to continue to purchasing student loans. Second Am. Compl. ¶ 69. To improve its balance sheet, HSBC undertook various loan transactions that resulted in HSBC "hav[ing] no legal right, title or interest in the loans." *See id.*[6] Plaintiffs further

---

[6] As noted earlier, *supra* n. 4, other allegations are to the contrary, claiming that HSBC actually owned the loans at the time of the collection actions. *See id.* ¶¶ 53–54; *see also* ¶ 69 (noting that HSBC "repurchased certain loans from EduCap").

aver that, while HSBC changed course regarding the selling of its loans, "*Educap hatched a plan to use the courts to obtain borrower payment proceeds for defaulted loans*," and that "*Educap has been attempting to recover, for themselves*, borrower payment proceeds that should have gone" elsewhere. *See id.* ¶ 71 (emphases added); *see also* ¶ 73 (describing collecting on defaulted loan payments as "EduCap's scheme"). To carry out this scheme, "EduCap used HSBC's name in fraudulently concealing" EduCap's status as a debt collector, and it retained Weinstock to represent it in collection proceedings. *Id.* ¶ 47. Importantly, Plaintiffs concede the absence of any relationship between HSBC and Weinstock: "During this period, Weinstock only represented EduCap. Weinstock was not employed by HSBC, retained by HSBC, did not have an attorney/client relationship with HSBC, and was not compensated by HSBC." *Id.* ¶ 38. Thus, Weinstock's actions, as counsel, cannot be attributed to HSBC. In sum, although HSBC's name is splashed all over the complaint, one searches in vain to find any alleged action it actually took in furtherance of the alleged unlawful debt collection scheme. Plaintiffs' Second Amended Complaint therefore does not contain sufficient factual matter, accepted as true, to establish that their injuries are "fairly traceable" to HSBC. *See Arpaio*, 797 F.3d at 19. Thus, they lack standing to assert claims against HSBC. *Cf. Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1105–06 (D.C. Cir. 2008) (finding that an FDCPA plaintiff had sufficiently pleaded the causation element of constitutional standing with regard to a defendant debt collector by alleging that the debt collector and the plaintiff's credit union "worked in concert . . . to convert [funds] from the Plaintiff's Account" (alteration in original) (quoting the plaintiff's complaint)).

Plaintiffs defend their pleading as to HSBC's standing primarily by pointing to the fact that, in Quick's and Davis's debt collection cases, Weinstock moved more than once to substitute HSBC as the plaintiff. *See* Pls.' Opp'n at 17 & n.125. These allegations, Plaintiffs insist, establish

that HSBC's actions are "directly related" to Plaintiffs' injuries, as HSBC gave "tacit approval of approval of Weinstock and EduCap['s] unlawful conduct on behalf of HSBC," as evidenced by "Defendants . . . carpet-bombing thousands of L2L borrowers in HSBC's name for more than a decade without renunciation." Pls.' Opp'n at 17–18. Plaintiffs, however, fail to include any "tacit approval" theory in their Second Amended Complaint, either as a factual matter or as a basis for liability, which is fatal. *See Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 87 n.4 (D.D.C. 2010) ("[A] plaintiff may not amend her complaint by the briefs in opposition to a motion to dismiss."), *aff'd*, 424 F. App'x 10 (D.C. Cir. 2010). Moreover, the complaint's allegations concerning substituting HSBC as debt-collection plaintiffs do not implicate HSBC, as they relate only to conduct by EduCap and Weinstock. *See* Second Am. Compl. ¶ 42 ("Weinstock moved to change the caption . . ."); *id.* ¶ 46 (same); *id.* ¶ 44 ("Weinstock again moved to change the caption"); *id.* ¶ 47 ("EduCap used HSBC's name"); *id.* ¶ 48 (same). The contention that Weinstock had no relationship with HSBC only underscores the implausibility of Plaintiffs' insistence that HSBC caused it harm. *Id.* at ¶ 38.[7] The Second Amended Complaint, although often invoking HSBC's name, does not allege any conduct by HSBC that is "fairly traceable" to Plaintiffs' claimed injuries. Accordingly, Plaintiffs' claims are dismissed against HSBC for lack of standing.

b.     Quick's Standing

Next, the court addresses whether Quick has standing to bring his claims, although neither party has briefed the issue. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2000) (noting that federal courts have an independent obligation to determine whether subject-matter jurisdiction exists). Unlike Davis, Quick did not appear in the debt collection action and he has made no claim

_____

[7] Elsewhere, Plaintiffs claim that EduCap and HSBC are all jointly liable for "the acts and practices" of which Plaintiffs complain because all were "agents of the L2L partnership." *See* Second Am. Compl. ¶ 17. But that is no more than a legal conclusion, which is not entitled to a presumption of truth. *Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("[W]e are not bound to accept as true a legal conclusion couched as a factual allegation.").

of payment to satisfy the default or efforts to enforce the default judgment. *See* Pls.' Opp'n at 16 (acknowledging the D.C. Superior Court judgment against Quick was a default judgment); Hr'g Tr. (draft), April 18, 2018, at 4–5. Quick alleges injury in the form of "stress, anxiety, agitation, annoyance, emotional distress, and undue inconvenience," and "actual damages, including attorney's fees and costs resulting from the Defendants' unlawful debt collection practices." Second Am. Compl. ¶¶ 75–76. The attorney's fees, however, are those incurred in *this* action. *See* Hr'g Tr. at 5. Based on these allegations, the court finds that Quick has standing to press some of claims against EduCap and Weinstock, but not others. *See Davis v. Fed. Election Comm'n,* 554 U.S. 724, 734 (2008) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (internal quotation marks and citation omitted)).

Quick lacks standing to advance RICO claims. "A RICO plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by reason of the conduct constituting the violation.'" *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 279 (1992) (cleaned up). Quick does not claim any injury to business or property: He has not paid a cent to any Defendant as a result of the debt collection action. And the attorney's fees and costs that he has incurred in bringing this action, *see* Hr'g Tr. at 5, are not an adequate injury, as the "mere fact that continued adjudication would provide a remedy for an injury that is only the byproduct of the suit itself does not mean that an injury is cognizable under Art[icle] III." *Diamond v. Charles*, 476 U.S. 54, 70–71 (1986). Accordingly, Quick lacks standing to bring a RICO claim.

The same is true for the unjust enrichment claim. By failing to allege that he has paid or otherwise conferred a benefit on any Defendant, Quick has failed to allege an injury-in-fact as to that claim. *See Bregman v. Perles*, 747 F.3d 873, 876 (D.C. Cir. 2014) (stating that an essential

element of an unjust enrichment claim is that plaintiff conferred a benefit on defendant). Accordingly, Quick's unjust enrichment claim must be dismissed.

Quick, however, has alleged a sufficient injury with respect to his statutory unfair debt collection practice claims and abuse of process claim. For purposes of the FDCPA, a plaintiff is not required to show actual damages; an attempt to collect money in violation of the FDCPA will suffice. *See Molina v. FDIC*, 870 F. Supp. 2d 123, 320–21 (D.D.C. 2012) (citing *Miller v. Wolpoff Abramson, LLP*, 321 F.3d 292, 307 (2d Cir. 2003)). The District of Columbia Debt Collection Law ("DCDCL") likewise makes it unlawful to use fraudulent acts to "attempt to collect claims." D.C. Code § 28-3814(f). Additionally, emotional distress damages are recoverable for an abuse-of-process claim, which Quick claims to have suffered. *Cf.* Restatement (Second) of Torts § 670 (1977) (providing that damages for "emotional distress resulting from the bringing of the proceedings" are available for the tort of malicious prosecution). Quick therefore has standing to assert claims under the FDCPA, the DCDCL, and for abuse of process.

**B.      Dismissal Under Rule 12(b)(6)**

Defendants also argue that dismissal of all claims is warranted under Rule 12(b)(6) for multiple reasons:  (1) the doctrine of res judicata precludes Plaintiffs from bringing these claims; (2) Plaintiffs have failed to allege any facts to support their claims against HSBC; (3) Plaintiffs have failed to allege facts sufficient to make out each of their claims; and (4) the FDCPA claim is barred by the statute of limitations. For the reasons that follow, the court grants Defendants' motions to dismiss for failure to state a claim.

*1.      Res Judicata*

The question here is whether Plaintiffs are precluded from bringing claims that they have not asserted previously. The operative legal construct therefore is claim preclusion. *See Allen v.*

*McCurry*, 449 U.S. 90, 94 (1980) (explaining that claim preclusion bars the relitigating of issues that could or were raised in the prior action). When evaluating whether claim preclusion operates to bar a subsequent lawsuit, courts look to whether the prior litigation "(1) involv[ed] the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006). As the earlier cases involved judgments rendered by the D.C. Superior Court, District of Columbia law determines their preclusive effect. *See Youngin's Auto Body v. District of Columbia*, 775 F. Supp. 2d 1, 5 (D.D.C. 2011).

The parties here dispute only the first and third elements. As to the third element—the existence of a valid, final judgment—Plaintiffs contend that "[c]onsent and default judgments . . . do not constitute res judicata." Pls.' Opp'n at 15. This is wrong. Under District of Columbia law, "[c]onsent decrees generally are treated as final judgments on the merits and accorded *res judicata* effect." *Williams v. Gerstenfeld*, 514 A.2d 1172, 1179 (D.C. 1986). Likewise, District of Columbia law treats a default judgment as a final adjudication on the merits for res judicata purposes. *See Croley v. Winberg*, Civ.A. 94-7891, 1995 WL 270896, at *2 (D.D.C. Apr. 28, 1995) (citing *Thomas v. Marvins Credit, Inc.*, 76 A.2d 773, 776 (D.C. 1950) and *Woods v. Canaday*, 158 F.2d 184, 185 (D.C. Cir. 1946)). Accordingly, the third element of claim preclusion is satisfied here.

That leaves the first element, the "so-called identity element," which concerns the relatedness of the actions. *See Capitol Hill Grp. v. Pillsbury, Winthrop, Shaw, Pittman, LLC*, 569 F.3d 485, 490 (D.C. Cir. 2009). This element is satisfied "when the cases are based on the same nucleus of facts because it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory on which a litigant relies." *Id.* (internal quotation marks and citation omitted). Put another way, "claim preclusion is also intended to prevent

litigation of matters that *should have been* raised in an earlier suit." *Nat. Res. Def. Council v. EPA*, 513 F.3d 257, 261 (D.C. Cir. 2008) (internal quotation marks and citation omitted).  Defendants argue the current litigation is barred because Plaintiffs could have challenged EduCap's standing, the validity of Maiorca's affidavit, and the terms of the loan, in the D.C. Superior Court actions. *See* HSBC's Mem. at 18–19; EduCap & Weinstock's Mem. at 13–14.  Plaintiffs, meanwhile, contend that res judicata is no bar here because the earlier cases concerned "the enforceability of the promissory notes," not as in this case compliance with federal and District of Columbia law. *See* Pls.' Opp'n at 18–19; *accord* Pls.' Reply at 3 (characterizing their federal action as one "concern[ing] the Defendants' conduct in collecting the debts, not the validity of the underlying loans or judgments").

Defendants have the better argument.  The core matter to which Plaintiffs now object— that EduCap fraudulently established its standing in the debt collection actions through filing of the false Maiorca Affidavit—could have been litigated before the D.C. Superior Court.  Standing is an essential element of any claim, and the lack of standing is hardly an obscure defense.  As detailed above, Plaintiffs had ample opportunity and information to make that challenge against EduCap in the collection actions.  Plaintiffs themselves knew that HSBC had issued the student loans, as their loan documents make clear.  And, even if they had forgotten that fact at the time of the litigation, the loan documents attached to the debt-collection complaints put Plaintiffs on notice that they had not, as Maiorca attested, "entered into a written promissory note with EduCap," *see* Quick Compl. at 4; Davis Compl. at 4, but rather had with HSBC.  Thus, Plaintiffs could have contested EduCap's standing to bring the actions simply by pointing to the records attached to the complaints, which identified HSBC as the loans' issuer.  Thus, the cases recited by Plaintiff that stand for the principle that an unlawful debt collection practice and the debt itself do not share a

common nucleus of facts, *see* Pls.' Opp'n at 14 n.102, have no bearing here. Because this case and the collection actions involve the "same nucleus of facts," res judicata precludes Plaintiffs from bringing their claims. *Cf. Gerstenfeld*, 514 A.2d at 1179–80 (holding that res judicata applied to preclude home owners' suit to enjoin foreclosure where they had the opportunity but failed to challenge the validity of the debt in bankruptcy proceedings).[8]

Plaintiffs offer additional arguments for why res judicata does not apply, but none are persuasive. Plaintiffs assert that res judicata cannot apply here because, as courts have consistently held, FDCPA lawsuits are not compulsory counterclaims. *See* Pls.' Opp'n at 15. There are two problems with this line of argument. First, as noted previously, the focus of claim preclusion is not on a particular legal theory or claim, but rather on facts of the transaction or occurrence at issue. Thus, the fact that an FDCPA claim may not be a compulsory counterclaim is not dispositive. Second, under District of Columbia law, claim preclusion reaches more than compulsory counterclaims. *See Capitol Hill Grp.*, 569 F.3d at 492. It also reaches permissible counterclaims "when the relationship between the counterclaim and the plaintiff's claim is such that the successful prosecution of the second action would nullify the initial judgment or impair the rights established in the initial action." *Id.* (internal quotation marks and citation omitted). Here, if Plaintiffs were to prove that EduCap obtained standing in the D.C. Superior Court matters through fraud, that would effectively prevent EduCap, and perhaps others, from enforcing those D.C. Superior Court judgments. No court would allow EduCap to collect on a judgment determined to have been unlawfully obtained. So, even if Plaintiffs' claims are permissible counterclaims, they are barred by res judicata.

---

[8] This same analysis applies equally to Plaintiffs' contention that they were deceived by Defendants' inclusion of a contingency-based attorney's fee, when the loan agreement contained no such provision. Plaintiffs had the agreement before them to contest the legitimacy of the attorney's fee demand.

Additionally, Plaintiffs insist that the "fraudulent concealment" exception to res judicata applies here. *See* Pls.' Opp'n at 15. It does not. Fraudulent concealment is a recognized exception to res judicata, *see Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015), but not every alleged fraud qualifies. "Fraud by a party will not undermine the conclusiveness of a judgment unless the fraud was extrinsic, that is, it deprived the opposing party of the opportunity to appear and present the party's case." 46 Am. Jur. 2d, Judgments § 516; *cf. Laufer v. Westminster Brokers, Ltd.*, 532 A.2d 130, 133 (D.C. 1987) (stating, in the context of a defense to an enforcement action, that "the only type of fraud that may justify non-enforcement of an otherwise valid judgment of any court of competent jurisdiction . . . is extrinsic fraud"). In *Laufer*, for instance, the D.C. Court of Appeals rejected the party's claim that the fraud exception applied "because the issue of [the opposing party's] alleged fraud was one which might have been litigated in the original action." 532 A.2d at 136. So it is here. The fraud that Plaintiffs allege is not extrinsic. The alleged misrepresentation contained in the Mairoca Affidavit did not prevent Plaintiffs from contesting EduCap's standing in the debt collection actions, as explained above. The fraudulent concealment exception therefore does not save Plaintiffs from the res judicata effect of the adverse D.C. Superior Court judgments.

### 2. *Failure to State Any Claim Against HSBC*

For the same reasons Plaintiffs have failed to allege that their claimed injuries are "fairly traceable" to HSBC, they have failed to allege sufficient factual matter to support a plausible claim against HSBC. Once more, the Second Amended Complaint contains no facts connecting HSBC to the alleged scheme to defraud defaulted borrowers by misrepresenting EduCap's standing to bring collection actions. Accordingly, the court also dismisses all claims against HSBC for failure to state a claim.

### 3.      *Failure to State Cognizable Claims*

Defendants also argue that all of Plaintiffs' claims must be dismissed for failure to state cognizable claims. The court agrees that Plaintiffs' pleading of their RICO and FDCPA claims is fatally deficient. And, because the court dismisses Plaintiffs' federal claims, the court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and dismisses them for that reason. *See* 28 U.S.C. § 1367.

### a.      Substantive civil RICO claims

Plaintiffs' RICO claims fail because Plaintiffs do not plead two essential elements: (1) a pattern of "racketeering activity," which is demonstrated by the commission of at least two predicate offenses, and (2) an "enterprise." *See* 18 U.S.C. § 1962(a), (c); *see also* 18 U.S.C. § 1961(5) (defining "pattern of racketeering activity"). As to the first of those elements, Plaintiffs allege "mail fraud" to be the predicate "racketeering activity"—a contention based exclusively on the mailing of the Maiorca Affidavits. *See* Second Am. Compl. ¶¶ 35–36; Pls.' Opp'n at 21–25. The fatal flaw of this allegation is that courts do not allow "'litigation activities,' *such as filing fraudulent documents* or engaging in baseless litigation to serve as predicate acts for RICO," "where such acts constitute the *only* alleged fraudulent conduct." *Feld Entm't, Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 317 (D.D.C. 2012) (first emphasis added) (quoting *Daddona v. Gaudio*, 156 F. Supp. 2d 153, 162 (D. Conn. 2000)); *accord E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 13 (D.D.C. 2014) ("Abusive or sham litigation does not constitute a predicate act." (citing cases)). That principle squarely applies here.

In an attempt to avoid this well-accepted barrier, Plaintiffs argue that the mailing of the affidavit is not "litigation activity" because it was created and mailed *prior* to the filing of the litigation in D.C. Superior Court. *See* Hr'g Tr. at 18–20. This distinction is nonsensical. The

mailed Maiorca Affidavit, even if assumed to be false, was created solely for the purpose of initiating litigation. It was of no legal consequence until filed in the collection actions; the mere mailing of the falsified document would not constitute mail fraud. *See* 18 U.S.C. § 1342. Indeed, Plaintiffs implicitly acknowledge as much, alleging that the affidavit was sent "to network attorneys across the United States . . . to attach to EduCap's debt collection lawsuits." Second Am. Compl. ¶ 36. As Plaintiffs' RICO claim is premised entirely on mailings done for the purpose of litigation activity, they have failed to state a claim.[9]

Plaintiffs also fail to allege the existence of a RICO "enterprise." A RICO enterprise is defined as "any . . . partnership . . . association . . . [or] group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact "must have three structural features: 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *United States v. Eiland*, 738 F.3d 338, 360 (D.C. Cir. 2013) (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)). Individuals who act independently and without coordination, however, cannot constitute a RICO enterprise. *See Boyle*, 556 U.S. at 947 n.4.

The Second Amended Complaint asserts that "Defendants" violated the statute through their association with "the L2L enterprise." *See* Second Am. Compl. ¶¶ 87–88. But if by that Plaintiffs mean the original securitization vehicle, the L2L Trust—and it appears that they do, *see* Pls.' Opp'n at 32–34—then their own complaint pleads away the possibility that this entity could serve as a RICO enterprise. By Plaintiffs' own allegations, the L2L Trust "began to unravel in a failure of colossal proportions" following the recession in 2007, as EduCap was "unable to

---

[9] Given the court's resolution of this claim, it does not address Defendants' alternative argument: That Plaintiffs have failed to meet the heightened pleading requirements for fraud claims, as required by Rule 9(b) of the Federal Rules of Civil Procedure. *See* HSBC's Mem. at 27–28; EduCap & Weinstock's Mem. at 16–18.

continue purchasing L2L loans as agreed," which, in turn, necessitated that HSBC take other financial measures to improve its balance sheet. *See* Second Am. Compl. ¶¶ 68–69. This "failure of colossal proportions" occurred *five years* before EduCap filed suit against Quick. *See id.* ¶ 22. As the L2L Trust ended, so too did any association among Defendants that might have satisfied the statute's definition of an enterprise. Moreover, Plaintiffs' allegations belie interconnectedness among all Defendants. Weinstock is not alleged to have any role in the L2L Trust. Only EduCap and Weinstock are implicated in filing the collection actions. *Id.* ¶¶ 34–36, And Weinstock was neither employed, retained nor compensated by HSBC for those purposes. *Id.* ¶ 38. Thus, as alleged, the so-called "L2L enterprise" did not share the same purpose, did not have mutually dependent relationships, and did not have the longevity to pursue the alleged purposes. It therefore was not an "enterprise" for purposes of RICO.

b.    Civil RICO conspiracy claim

In addition, Plaintiffs allege that the trio of defendants conspired to commit violations of the RICO statute. Second Am. Compl. ¶ 89; *see* 18 U.S.C. § 1962(d). The RICO conspiracy provision makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [18 U.S.C. § 1962]." 18 U.S.C. § 1962(d). The pleading deficiencies in Plaintiffs' substantive RICO allegations mean that its conspiracy claim also fails.

4.    *Fair Debt Collection Practices Act*

Plaintiffs' FDCPA claim is against EduCap and Weinstock only, and those defendants seek dismissal of the claim on two grounds: (1) it is time-barred under the FDCPA's one-year statute of limitations; and (2) it fails to allege that EduCap and Weinstock handled Plaintiffs' loans only *after* they defaulted, as is required to be subject to the FDCPA, *see Parker v. BAC Home Loans Servicing LLP*, 831 F. Supp. 2d 88, 93 (D.D.C. 2011). *See* EduCap & Weinstock's Mem. at 28–

30. Because the court concludes that Plaintiffs' claim is time-barred, it does not analyze EduCap and Weinstock's alternative basis for dismissal.

The FDCPA requires actions to enforce liability under the Act be brought "within one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d). In cases such as this one, where the FDCPA claim is premised on the wrongful filing of a debt collection action, federal appellate courts generally have held that the claim accrues when the debtor is served with the complaint, as that is the date when the debtor receives notice of the action. *See, e.g., Lyons v. Michael & Assocs.*, 824 F.3d 1169, 1171–72 (9th Cir. 2016); *Serna v. Law Office of Joseph Onwuteaka, P.C.,* 732 F.3d 440, 446–48 (5th Cir. 2013). *But see Smith v. Lerner, Sampson & Rothfuss, L.P.A.*, 658 F. App'x 268, 273 (6th Cir. 2016) (using date of filing as date of accrual). Applying this approach, Plaintiffs' FDCPA claim would be time barred: They did not file this action within one year of service, and they do not contend otherwise. *See* Pls.' Opp'n at 35 (arguing that "Quick and Davis'[s] claims are timely because Defendants fraudulently concealed their conduct").

Still, Plaintiffs argue that the statute of limitations should be tolled because Defendants fraudulently concealed their actions, thus preventing Plaintiffs from learning of the violation. *See* Pls.' Opp'n at 35–37. They contend that the statute of limitations began to run only when the final caption change to the debt-collection actions occurred. *See id*. at 35–37. For Quick, that would be May 16, 2017; for Davis, on April 24, 2017. *Id*. at 37. Fraudulent concealment is an "equitable doctrine [that] is read into every federal statute of limitations," which equitably tolls the statute of limitations. *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946). To prove fraudulent concealment, a plaintiff must show that the defendant engaged in conduct designed to conceal evidence of their wrongdoing, and that the plaintiff lacked actual or constructive notice of that evidence, despite

exercising diligence. *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (citing *Larson v. Northrop Corp.*, 21 F.3d 1164, 1172 (D.C. Cir. 1994)). "Generally, fraudulent concealment requires that the defendant make an affirmative misrepresentation tending to prevent discovery of the wrongdoing." *Id.*

Applying those principles here, Plaintiffs have failed to adequately plead fraudulent concealment. For starters, Plaintiffs have not pleaded any affirmative misrepresentation by EduCap or Weinstock that prevented them from discovering the falsity of the Maiorca Affidavit. Although the Maiorca Affidavit itself purportedly contains a false and misleading statement, neither EduCap nor Weinstock is alleged to have done anything to conceal its falsity. Moreover, as already discussed, the loan documents attached to the complaints contained ample information that should have alerted Plaintiffs—if they did not know already—that HSBC had issued their now-defaulted loans, not EduCap. On the facts alleged in the Second Amended Complaint, Plaintiffs cannot plausibly maintain that their claims are timely by operation of equitable tolling.

Plaintiffs also seek to avoid the limitations by arguing that the "continuing violations" doctrine applies. Here, Plaintiffs insist that Defendants' continued deceitful acts during the litigation reach back to the events outside the one-year limitations period that precede the filing of their FDCPA claim. Pls.' Opp'n at 37. Under Plaintiffs' proffered application of this doctrine, a misrepresentation by Defendants during the statute of limitations period for Quick's and Davis's FDCPA claims—here, the simple maintenance of the debt-collection action—would save the claims from being time-barred. However, the federal appellate courts uniformly have held that the continuing violation doctrine does not apply to the FDCPA. *See Slorp v. Lerner, Sampson & Rothfuss*, 587 F. App'x 249, 257 (6th Cir. 2014) ("No court of appeals has held that debt-collection litigation (or a misleading statement made in connection with that litigation) is a continuing

violation of the FDCPA." (citing *Schaffhauser v. Citibank (S.D.) N.A.*, 340 F. App'x 128, 131 (3d Cir. 2009) (per curiam) and *Naas v. Stolman*, 130 F.3d 892, 893 (9th Cir. 1997)); *Gajewski v. Ocwen Loan Servicing*, 650 F. App'x 283, 286 (7th Cir. 2016) ("The continuing violation doctrine, which actually concerns cumulative violations, does not apply to a series of discrete acts, each of which is independently actionable, even if those acts form a pattern of wrongdoing." (internal quotation marks and citation omitted)). The continuing violation doctrine therefore cannot save Plaintiffs' time-barred FDCPA claims from dismissal.

5. *State Law Claims*

Having dismissed Plaintiffs' federal law claims, the court declines to exercise jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c); *Anderson v. Holder*, 647 F.3d 1165, 1174 (D.C. Cir. 2011) (permitting district court to decline to exercise supplemental jurisdiction when it has dismissed all claims over which it has general jurisdiction). Accordingly, the court does not address Defendants' arguments under Rule 12(b)(6) for dismissing those claims.

C. **Motion for Leave to Amend**

In light of the court's rulings, allowing Plaintiffs to amend their complaint would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Accordingly, their Motion for Leave to Amend is denied.

III. **CONCLUSION**

For the reasons stated, Defendants' motions to dismiss, ECF Nos. 15, 17, are granted. The court also denies Plaintiffs' Motion for Leave to File Second Amended Complaint, ECF No. 24, and therefore dismisses Plaintiffs' First Amended Complaint with prejudice. *See Firestone*, 76 F.3d at 1209 ("A dismissal with prejudice is warranted only when a trial court determines that the

allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." (citations and quotation marks omitted)).

A separate, final order accompanies this Memorandum Opinion.

Dated: July 12, 2018

Amit P. Mehta
United States District Judge